**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **IN RE: DONALD ANDERSON** | ) | **Case No. 1:06cv160** |
| | ) | **Case No. 1:06cv161** |
| | ) | **Case No. 1:06cv162** |
| | ) | **Case No. 1:06cv163** |
| | ) | |
| | ) | |

## MEMORANDUM OPINION

In this bankruptcy appeal, appellant-debtor Donald Anderson ("Anderson") appeals the

bankruptcy court's decision to allow the claims of four creditor-appellees to proceed over the

bankruptcy trustee's objections.[1]  As an initial matter, appellees seek dismissal of these appeals

as equitably moot, pursuant to Rule 8011, Fed. R. Bankr. P.  Specifically, appellees argue that

Anderson's objection to payment of the disputed claims constitutes an impermissible collateral

attack on the reorganization plan because Anderson failed (i) to appeal the bankruptcy court's

order confirming the trustee's reorganization plan or (ii) to seek a stay of enforcement of the

reorganization plan.  On the merits, and assuming the appeal is not equitably moot, the appeal

presents four questions:[2]

---

[1]Because Anderson asserted the same objections to each of the four allowed claims, his appeals of the orders allowing the claims have been consolidated.

[2]In his statements of the questions presented on appeal, Anderson lists numerous questions presented.  Yet, Anderson's briefs and oral argument discussed only five of his listed issues.  Accordingly, Anderson's failure to address the remaining questions presented will be construed as a waiver of such claims.  *See Canady v. Crestar Mortgage Corp.*, 109 F. 3d 969, 973-74 (4th Cir. 1997) (finding that issues raised in notice of appeal, but not briefed on appeal, are waived).

(i)     Whether the bankruptcy court erred in denying Anderson's motion to stay the bankruptcy proceedings, pending resolution of a criminal charge against him, based on his assertion of the Fifth Amendment privilege against self-incrimination;

(ii)    Whether the bankruptcy court erred in precluding Anderson from introducing depositions that had not been timely designated in accordance with the scheduling order;

(iii)   Whether the bankruptcy court erred in ruling that appellees, One Stop Services and Joseph Ward, while not licensed in Virginia could nonetheless recover as claimants because they fell within the good faith exception to Virginia's Licensing statute;[3]

(iv)    Whether the bankruptcy court erred in ruling that a *prima facie* valid claim is sufficient to establish the claim where no evidence was adduced to the contrary; and

(v)     Whether the bankruptcy court erred in allowing the Unsecured Committee of Creditors to participate in the bankruptcy proceeding on behalf of the Committee members.

## I.

The material facts are essentially undisputed and may be succinctly stated.  On April 10, 2000, Anderson purchased an unimproved, six-acre plot of land located in Stafford County, Virginia.  Approximately one week later, Anderson entered into a contract with his father, Charles Anderson, a licensed professional engineer, to supervise the construction of a 6,000 square foot house on that land ("the Anderson residence").  Pursuant to the agreement with his son, Charles Anderson hired numerous subcontractors to perform work on the Anderson residence.  Although these subcontractors substantially completed construction of the Anderson residence, virtually none received payment for the services they rendered.

---

[3]Va. Code Ann. § 54.1-1115(A)(1).

Shortly after construction ended, Charles Anderson filed for bankruptcy under Chapter 7,[4] seeking to discharge more than $500,000 in claims associated with construction of the Anderson residence.[5]  Frustrated with their inability to recover from Charles Anderson, several suppliers and subcontractors then placed mechanics liens on the Anderson residence.  For his part, Donald Anderson argued that he had satisfied his contractual obligation to his father by paying him $46,000 (for a house valued at approximately $700,000), and therefore could not be held liable for any claims associated with the construction of the Anderson residence.  Unpersuaded by Donald Anderson's denial of liability, contractors and suppliers filed more than twenty lawsuits against him.  As a result of this flurry of litigation, Donald Anderson, following his father's example, filed for bankruptcy, although Donald Anderson elected to do so under Chapter 11.[6] Thereafter, creditors of Donald Anderson, including the four appellees, filed over sixty claims seeking payment for costs incurred in building the Anderson residence.  Anderson filed objections to the overwhelming majority of these claims, including the four claims in issue here.

On August 2, 2004, Anderson was indicted in Prince William County Circuit Court on one count of felony conspiracy.  On January 10, 2005, the indictment was amended to reflect one felony  count of obtaining property by false pretenses, in violation of Va. Code § 18.2-178. Following Anderson's indictment, a trustee, Kevin McCarthy, was appointed to replace Anderson in his capacity as debtor-in-possession of the Anderson bankruptcy estate.  This estate consisted of two items of real property: (i) property Anderson owned in South Carolina; and (ii)

---

[4]11 U.S.C. § 701 *et seq.*

[5]*In re Charles M. Anderson*, Case No. 02-82364-RGM.

[6]11 U.S.C. § 1101 *et seq.*

3

the Anderson residence.

On May 10, 2005, Anderson, by counsel, consented to the entry of a bankruptcy court scheduling order setting the hearing on Anderson's claim objections for September 8, 2005. On August 15, 2005, approximately three weeks before the hearing, Anderson noticed his intent to assert his Fifth Amendment privilege against self-incrimination at the hearing. A week later, on August 22, 2005, Anderson filed a motion for stay of the claim objection proceeding pending resolution of the criminal charge filed against him. The bankruptcy court denied Anderson's application for the stay because (i) Anderson had expressly consented to the hearing date, notwithstanding his knowledge of a pending criminal charge; (ii) Anderson moved for the stay only two weeks before the scheduled hearing date; and (iii) the criminal charge against Anderson had not yet been set for trial. In a bench ruling denying the stay, the bankruptcy court, for other reasons, rescheduled the final hearing on Anderson's claim objections from September 8, 2005 to September 23, 2005.

On December 2, 2005, the bankruptcy court overruled Anderson's objections to the four claims in issue here. *In the matter of Donald Anderson*, Case No. 04-11437 (E.D. Va. Bankr., December 2, 2005) (Order). Thereafter, on December 12, 2005, Anderson filed a timely appeal contesting, *inter alia*, the bankruptcy court's decision allowing these claims. Yet, at no time did Anderson seek a stay of this order, or any other orders, allowing claims against the bankruptcy estate.

On December 19, 2005, the bankruptcy court confirmed the Trustee's Amended Plan of Reorganization ("the Plan"). The Plan called for the trustee to liquidate the estate and to begin immediately disbursing proceeds from the sale of estate property to pay any and all "allowed

claims." The Plan defined an "allowed claim" as any claim to which the bankruptcy court "[o]rder allowing such claim has not been stayed." Thus, all creditors with claims allowed by the bankruptcy court (none of which were stayed), were entitled to satisfaction of their claims from the proceeds of the sale of bankruptcy estate property. At issue here are four of the "allowed claims." Anderson did not appeal the bankruptcy court's approval of the Plan, nor did he seek a stay of the Plan's execution. Accordingly, the trustee, pursuant to the Plan, sold all of the assets in the bankruptcy estate, including the Anderson residence. The sale netted $744,235.98.[7] On or about January 3, 2006, the trustee began to pay in full the "allowed claims," including those asserted by appellees. A month later, on February 10, 2006, Anderson timely filed the instant appeal of the bankruptcy court's December 2, 2005 Order. By May 2006, the trustee had paid, in full, all allowed claims. At this time, only $231,929.56—approximately 31% of the total estate—remains. The distribution of these remaining funds awaits the resolution of the litigation between Anderson and the trustee.

## II.

The threshold question is whether Anderson's appeal of the bankruptcy court's order approving the disputed claims is equitably moot. In this respect, appellees, as the moving parties, bear the burden of showing that Anderson's appeal is equitably moot and should be dismissed.[8]

---

[7]The bankruptcy estate received $20,685.06 from sale of property Anderson owned in South Carolina, and $723,550.92 from sale of the Anderson residence.

[8]*Southern Pac. Transp. Co. v. Voluntary Purchasing Groups*, 246 B.R. 532, 534 (E.D. Tex. 2000) ("Obviously, the burden is upon the party asserting the equitable mootness doctrine to prove that it applies."); In *re Focus Media, Inc.*, 378 F.3d 916, 923 (9th Cir. 2004) (stating that "the party asserting mootness has a heavy burden to establish that there is no effective relief remaining for a court to provide").

The doctrine of equitable mootness applies chiefly in bankruptcy proceedings because of the equitable nature of bankruptcy judgments.  Essentially, equitable mootness "is a pragmatic principle grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable."  *Mac Panel Co. v. Virginia Panel Corp.*, 283 F.3d 622, 625 (4th Cir. 2002).  In the bankruptcy context, equitable mootness asks "whether it would be prudent to upset the plan of reorganization at this late date."  *Matter of UNR Industries, Inc.*, 20 F.3d 766, 769 (7th Cir. 1994).  Thus, unlike the constitutional doctrine of mootness, which bars consideration of appeals because no Article III case or controversy exists, equitable mootness is often invoked when it would be unfair or impractical to grant the relief requested.  *See Mac Panel*, 283 F.3d at 625.  Put differently, the question is not whether the court has the ability "to award some fashion of meaningful relief, " *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992) (test for Article III mootness); rather, the question is whether prudence counsels against upsetting the plan of reorganization.  *See Matter of UNR Industries, Inc.*, 20 F.3d at 769 (distinguishing equitable mootness from Article III mootness).

To that end, the Fourth Circuit has adopted a four-part balancing test to determine whether an appellant's appeal of a bankruptcy court's decision is equitably moot.  To prevail, the appellees here must demonstrate that after consideration of the following four factors, the relief Anderson seeks should be denied.  The four factors are: (i) whether the appellant – here Anderson – sought and obtained a stay; (ii) whether the reorganization plan, or other equitable relief, has been substantially consummated; (iii) the extent to which the relief requested on appeal would affect the success of the reorganization plan or other equitable relief granted; and

(iv) the extent to which the relief requested on appeal would affect the interests of third parties. *Mac Panel*, 283 F.3d at 625.[9]  The question, then, is whether these factors, taken together, suggest that, irrespective of the merits of the appeal, it would be imprudent to disturb the Plan at this late date.

As to the first factor – whether the appellant sought and obtained a stay – it is undisputed that Anderson did not seek a stay of the December 2, 2005 Order.  For his part, Anderson argues that he did not request a stay because it would have been futile, as he did not have the financial means to post a supersedeas bond in the amount of the judgment.  This argument proves too much.  Were it sufficient to argue, as Anderson does, that his failure to seek a stay should be excused because he was unable to post the requisite bond, virtually every debtor appealing an adverse judgment of a bankruptcy court would be excused from seeking a stay.  This is so because debtors in bankruptcy, by definition, have modest financial means relative to their liabilities.  Because acceptance of this excuse – an excuse common to all debtors in bankruptcy – would render the first factor in the equitable mootness analysis a nullity, courts in this circuit, and elsewhere, have sensibly declined to accept it.[10]  Thus, debtors are not relieved of the

---

[9]*See also In re U.S. Airways Group, Inc.,* 369 F.3d 806, 809 (4th Cir. 2004) (weighing same factors); *In re Shawnee Hills, Inc.*, 125 Fed.Appx. 466, 469-70 (4th Cir. 2005) (unpublished opinion) (same).

[10]*See also TWA, Inc. v. Texaco, Inc.*, 92 B.R. 38, 46 (S.D.N.Y.1988) ( "[T]here fairly exists a strong presumption that appellants' challenges have been rendered moot due to their ***inability*** or unwillingness to seek a stay." (emphasis added); *United States v. GWI PCS 1, Inc.*, 245 B.R. 59, 62 (N.D. Tex. 1999) ("Failure ***or inability*** to obtain a stay pending appeal carries the risk that review may be precluded because of mootness.") (emphasis added).  *Also cf. In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 145 (2d Cir. 2005) ("Having sought no stay of the bankruptcy court's order (and no expedited appeal), appellants bear the burden of this uncertainty."); *In re Chateaugay Corp.*, 988 F.2d 322, 326 (2d Cir. 1993) ("The party who

consequences of failing to obtain a stay simply because they claim to lack the means to post a

bond.  To the contrary, where, as here, a debtor-appellant fails to obtain a stay pending appeal,

that debtor must bear "the risk that review might be precluded on mootness grounds."  See *Matter*

*of Manges*, 29 F.3d 1034, 1040 (5th Cir. 1994); *In re Mountain Laurel Resources Co.*, 1999 WL

33542427, *4 (S.D. W.Va., 1999) (same).

      The second equitable mootness factor – whether the Plan has been "substantially

consummated" – is also plainly met here.  Specifically, section 1101(2) of the Bankruptcy Code

defines "substantial consummation" as follows:

> (A) transfer of all or substantially all of the property proposed by the plan to be
> transferred;
>
> (B) assumption by the debtor or by the successor to the debtor under the plan of
> the business or of the management of all or substantially all of the property dealt
> with by the plan; and
>
> (C) commencement of distribution under the plan.
>
> 11 U.S.C. § 1101(2).

It is undisputed that the trustee, pursuant to the Plan, has already transferred roughly 70% of the

bankruptcy estate.  Thus, all the elements of § 1101(2) have been satisfied and the Plan has been

substantially consummated.  Therefore, this factor also weighs in favor of finding Anderson's

appeal equitably moot.[11]

_____

appeals without seeking to avail himself of that protection does so at his own risk.").

    [11]Anderson maintains that the Plan has not been "substantially consummated" because, as
of March 2006, approximately 31% of the estate had yet to be distributed.  This argument is
unpersuasive because § 1101(2) makes clear that "substantial consummation" requires only
"commencement of distribution," not completion of distribution.  Moreover, all allowed claims
have been paid in full; all that remains to be determined is the proper trustee fee.  Were it
sufficient to argue, as Anderson does, that a bankruptcy plan is not "substantially consummated"

Analysis of the third factor – whether the relief requested on appeal would cause the reorganization plan to "unravel" – requires a more detailed examination of the Plan.  *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 236 (3d Cir. 2000) (denying equitable mootness where portions of the plan could be easily severed and undone without affecting the remainder of the plan).  This factor asks whether granting the relief appellant seeks would "knock the props out from under the authorization for *every* transaction that has taken place and create an *unmanageable, uncontrollable* situation for the Bankruptcy Court."  *Id.* (emphasis added).[12]  As noted, answering this question requires an examination of the Plan's distribution scheme.

The Plan at issue is a straightforward liquidation plan calling for the trustee to (i) sell the two properties in the estate; (ii) pay all allowed claims in full; and (iii) return any residual funds (after expenses and fees have been paid) to Anderson.  Importantly, Anderson does not challenge the Plan itself; rather, he challenges only a discrete subset of "allowed claims" permitted under the Plan.  Thus, the relief requested by Anderson, namely a new hearing to contest the allowed claims, would result in neither reacquiring money or property from third parties,[13] nor "unscrambling" entities that merged in reliance on the reorganization plan.[14]  To the contrary,

---

even if all claims have been paid, then as long as there is a pending satellite dispute between the debtor and the trustee, the debtor would have the ability to manipulate the equitable mootness analysis by controlling when a bankruptcy plan becomes "substantially consummated."  This result should not be countenanced.

[12]*See also In re Chateaugay Corp.*, 10 F.3d 944, 952 (2d Cir. 1993) (same).

[13] *Cf. Rochman v. Northeast Utils. Serv. Group*, 963 F.2d 469 (1st Cir. 1992) (appeal equitably moot where reorganization plan affected "innumerable third parties").

[14] *Cf. In re Continental Airlines*, 91 F.3d 553, 567 (3d Cir. 1996) (finding that equitable mootness barred an appeal where "investors and other third parties consummated a massive reorganization in reliance on an unstayed confirmation order").

were Anderson to prevail on this appeal, and then defeat the claims after a new hearing as well, the claims in issue, at most, would be disallowed and appellees would have to "disgorge money [they] received, money that would then be distributed pursuant to the bankruptcy court's final decree." *In re Focus Media, Inc.*, 378 F.3d 916, 924 (9th Cir. 2004) (declining to invoke equitable mootness in part because compelling disgorgement of attorney's fees would affect only the party that received the fees).[15]  In other words, the relief sought here by Anderson would not undo the entire Plan.  At most, only four of the claimants (the appellees) might be required to return to the estate the funds they received pursuant to the Plan.

It is also significant to note that the type of relief Anderson seeks here appears to have been considered by the bankruptcy court in shaping the Plan.  To that end, it is undisputed (i) that the Plan permits appeals of "allowed claims"; and (ii) that Anderson filed a timely appeal of the "allowed claims" in issue here.  Given that the Plan expressly provides for appeals of "allowed claims," it is difficult to see, absent evidence of misconduct or dilatoriness not present here, why considerations of equity should preclude Anderson from exercising his right to appeal the allowed claims.  For all these reasons, the third factor weighs against a finding of equitable mootness.

The fourth and final factor – the impact that awarding the relief appellant seeks would have on third parties – also militates against finding equitable mootness.  In this respect, it is worth reemphasizing that Anderson's appeal would, at most, result ultimately in a new hearing on the disputed claims, which in turn might result in a requirement that appellees repay the sums originally received from the estate under the Plan.  No persons or entities other than appellees

---

[15]*See also S.S. Retail Stores Corp. v. Ekstrom*, 216 F.3d 882, 884 (9th Cir. 2000) (same).

would be affected.  Indeed, appellees have not pointed to any third parties whose interests would be impacted were appellees' claims invalidated on appeal.  *Cf. In re Public Serv. Co.,* 963 F.2d 469, 474 (finding equitable mootness where there were "innumerable transfers legitimately effected to and among innocent third parties").

In sum, then, the relevant factors appear to be in equipoise: two factors weigh in favor of equitable mootness and two factors weigh against it.  Yet, this is not the appropriate calculation, for while the factors appear to be in equipoise, "these factors are given varying weight, depending on the particular circumstances."  *In re PWS Holding Corp.*, 228 F.3d at 236.  For example, where the reorganization plan involves intricate transactions or has affected third parties, greater weight may be given to whether the plan has been substantially consummated. *See id.*  On the other hand, where the reorganization plan does not involve intricate transactions or affect third party interests, greater weight may be given to the third and fourth factors – the extent to which the relief requested on appeal would affect the success of the reorganization plan and the interests of third parties.[16]

These principles applied here compel the conclusion that Anderson's appeal is not equitably moot.  As noted above, it is pellucidly clear that the only claims affected by Anderson's appeal are those of the appellees.  Thus, if Anderson succeeds on appeal, a rehearing on remand would, at most, only cause a redistribution of the funds distributed to the appellees, but would not affect other claimants or third parties.  *See In re PWS Holding Corp.*, 228 F.3d at 236

_____

[16]This is in accord with a leading bankruptcy treatise's observation that "[w]hether a court can provide effective relief to a party appealing an order of confirmation should not depend on whether the plan has been substantially consummated."  7 *Collier on Bankruptcy* ¶ 1101.01[1][c] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. 2005).

(denying equitable mootness where there existed an "intermediate option," which would affect only certain portions of the plan and not unravel the entire plan).  As such, there is no danger that Anderson's appeal, if successful, would reverse or unravel the entire plan of reorganization. Put simply, the relief sought by Anderson does not result in unscrambling the entire omelette, just four of the eggs; and hence, the whole omelette, or for that matter the whole Pan, would not be significantly disrupted.  Given this, appellees have failed to carry their burden and it is appropriate to deny appellees' motion to dismiss Anderson's appeal on equitable mootness.[17]

### III.

### A.

On the merits, Anderson first objects to the bankruptcy court's denial of his motion to stay the bankruptcy proceedings.[18]  Specifically, he argues that by denying his motion to stay the bankruptcy proceedings pending resolution of the criminal charge against him, the bankruptcy court impermissibly forced him to choose between (i) exercising his Fifth Amendment right against self-incrimination, in which case he could avoid testifying (and being cross-examined) in the criminal proceeding, but would then have to remain silent during the bankruptcy proceeding or (ii) testifying in the bankruptcy proceeding, thereby waiving his Fifth Amendment privilege

---

[17]This is not to say that equitable mootness would never bar appeal of an adverse bankruptcy court determination involving a liquidation plan.  To the contrary, there may be many circumstances where severe harm to other parties weighs decisively against allowing an appeal.  *See, e.g.*, *In re Continental Airlines*, 91 F.3d at 565 (finding that equitable mootness barred an appeal where "investors and other third parties consummated a massive reorganization in reliance on an unstayed confirmation order").

[18]The denial of a decision to stay civil litigation in the face of parallel criminal proceedings is within the sound discretion of the district court, and accordingly, is reviewed for abuse of discretion.  *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1st Cir. 2004).

and leaving him vulnerable to cross-examination in the criminal proceeding.  The horns of this

dilemma, Anderson might suggest, are especially sharp, given that if he chooses to remain silent

for the sake of his criminal case, his required, concomitant silence in the bankruptcy proceeding

might, in appropriate circumstances, allow the fact-finder to draw the adverse inference that had

he testified, his testimony would have been unfavorable to him.  *See Baxter v. Palmigiano*, 425

U.S. 308, 318 (1976); *United States ex rel. DRC, Inc. V. Custer Battles, LLC,* 415 F. Supp. 2d

628, 632-33 (E.D. Va. 2006); *In re Phillips, Beckwith & Hall*, 896 F. Supp. 553, 559-560 (E.D.

Va. 1995).

        Yet, however sharp the horns may be, this dilemma is not uncommon in civil litigation

and courts in these cases have made two principles unmistakably clear:

     (i)     The Constitution does not require a stay in these cases[19] and

     (ii)     The grant or denial of a stay in these cases is committed to the sound discretion of

          the district court.[20]

Thus, while the Constitution does not mandate the stay of civil proceedings in the face of parallel

criminal proceedings, "a court may decide in its discretion to stay civil proceedings, postpone

civil discovery, or impose protective orders and conditions 'when the interests of justice seem to

require such action.'" *Harbour Town Yacht Club Boat Slip Owners Ass'n v. Safe Berth*

_____

[19]*See Keating v. OTS*, 45 F.3d 322, 326 (9th Cir. 1995); *Afro-Lecon, Inc. v. United States*, 820 F.2d 1198, 1202 (Fed. Cir. 1987); *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C. Cir. 1980).

[20]*United States v. Georgia Pacific* Corp., 562 F.2d 294, 296 (4th Cir. 1977).  See *also Afro-Lecon, Inc. v. United States*, 820 F.2d 1198, 1202 (Fed. Cir. 1987); *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C. Cir. 1980); *Kashi v. Gratsos*, 790 F.2d 1050, 1057 (2d Cir. 1986).

*Management, Inc.*, 411 F. Supp. 2d 641, 643-44 (D.S.C. 2005).[21]  More specifically, in

determining whether to stay a civil proceeding, the guiding principles are

> (i) the interests of the civil plaintiff in proceeding expeditiously with the civil litigation, including the avoidance of any prejudice to the plaintiff should a delay transpire; (ii) the hardship to the defendant, including the burden placed upon him should the cases go forward in tandem; (iii) the convenience of both the civil and criminal courts; (iv) the interests of third parties; and (v) the public interest.

> *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d at 78.[22]

Given these principles, the question here is whether the bankruptcy court abused its discretion in

denying Anderson's motion to stay the bankruptcy proceeding.[23]  A review of the record reveals

it was not.  The record reflects that the bankruptcy court was well within its discretion to deny

Anderson's motion to stay the bankruptcy hearing.  To begin, on May 10, 2005, Anderson

consented to the scheduling Order setting the hearing date for September 8, 2005.  At that time,

Anderson had been under indictment for more than nine months and should have been aware of

the Fifth Amendment dilemma he might face.  Yet, rather than seek a stay of the September

---

[21]*See also Landis v. North American Co.*, 299 U.S. 248, 254-55 (1936) (decision whether to stay "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance").

[22]*See Afro-Lecon*, 820 F.2d at 1206 (remanding for lower court to determine whether requested stay would create "appreciable prejudice" to opposing party's case); *Wehling v. Columbia Broadcasting Sys.*, 608 F.2d 1084, 1089 (5th Cir. 1979) (recognizing lower court's discretion to terminate stay if party establishes prejudice). *See also United States v. Certain Real Property 566 Hendrickson Boulevard*, 986 F.2d 990, 996 (6th Cir. 1993); *United States v. All Assets of Statewide Auto Parts*, 971 F.2d 896, 905 (2d Cir. 1992); *United States v. Certain Real Property, Commonly Known as 6250 Ledge Road*, 943 F.2d 721, 729 n.9 (7th Cir. 1991); *United States v. Parcels of Land*, 903 F.2d 36, 44 (1st Cir. 1990); *United States v. U.S. Currency*, 626 F.2d 11, 15-17 (6th Cir. 1980) (all holding same).

[23]It appears that the bankruptcy court denied Anderson's motion to stay in an oral ruling from the bench.  *See In re: Donald Anderson*, Case No. 04-11437 (September 7, 2005) (Order). But, the transcript from this hearing has not been made part of the record on appeal.

hearing at that time, Anderson waited more than three months after issuance of the scheduling

Order and almost one year after his indictment before doing so.  In the end, Anderson waited

until only two weeks before the scheduled hearing to raise his concerns about the parallel

proceedings and his Fifth Amendment privilege. Given Anderson's dilatory behavior, the

bankruptcy court reasonably may have believed that Anderson intentionally delayed filing his

motion to stay for strategic reasons.  *See, e.g.*, *Combustion Engineering, Inc. v. Miller Hydro

Group*, 760 F.Supp. 9, 12 (D. Me. 1991) (denying request for stay filed "on the eve of trial").

Additionally, and perhaps more importantly, at the time Anderson moved for a stay of the

bankruptcy proceedings, no trial date had been set for the criminal proceedings.  Without any

idea of a possible end date for the criminal case, the bankruptcy court reasonably understood that

any stay granted might last for an indefinite period, to the prejudice of appellees.[24]  Indeed,

where, as here, the bankruptcy proceedings were likely to turn on the credibility of witnesses'

testimony regarding events that occurred several years prior, the witnesses' recollection of those

events was critical to the outcome.  *See In re Phillips, Beckwith & Hall*, 896 F. Supp. 553,

559-560 (E.D. Va. 1995) (noting that party opposing stay can be prejudiced by fading

memories).[25]  Given the need to resolve the matter while the relevant events were still somewhat

fresh in witnesses' minds, the bankruptcy court was well within its discretion to conclude that

---

[24]At oral argument, counsel for both parties agreed that the bankruptcy court was unable to forecast when the joint criminal proceedings against both men might conclude in part because Charles Anderson had indicated his intent to assert a defense of mental incapacity to the pending criminal charges; therefore, additional briefing and psychological testing would be required before the trial could proceed.

[25]*See also Afro-Lecon*, 820 F.2d at 1206 (party is not entitled to delay resolution of a civil action, even to accommodate her Fifth Amendment interests, if her adversary's case will deteriorate as a result of the stay); *Wehling*, 608 F.2d at 1089 (same).

indefinite delay of the bankruptcy proceeding would substantially prejudice appellees.  This is especially true, given that appellees, at that time, had already been seeking relief for approximately five years.  *See id.*  Thus, in evaluating Anderson's motion to stay, the bankruptcy court was entitled to conclude that the risk of substantial prejudice to appellees outweighed Anderson's untimely request for the stay.  For all of these reasons, the bankruptcy court did not abuse its discretion in denying Anderson's motion to stay the claim hearing until the completion of his criminal proceedings.[26]

## B.

Anderson next argues that the bankruptcy court abused its discretion in precluding him from introducing the depositions of two contractors who performed work on the Anderson residence to support Anderson's objections to the filed claims.  In deciding to bar introduction of the deposition, the bankruptcy court determined that Anderson violated a pretrial order by failing to file and serve a copy of these depositions in a timely manner.  *See* Transcript of September 23, 2005 Hearing at 163-64.  This ruling is reviewed here for abuse of discretion.  *See Persinger v. Norfolk & W. Ry. Co.*, 920 F.2d 1185, 1187 (4th Cir. 1990).

Anderson now offers several unpersuasive *post hoc* rationalizations for his dilatoriness.  Essentially, Anderson argues that the "whirlwind of [litigation] activity" made it difficult to comply with the pretrial order.  While it would have been within the bankruptcy court's discretion to accept Anderson's excuses, and admit the depositions as untimely.  Courts routinely

---

[26]This is not to say that the Anderson was not in a difficult position with respect to his Fifth Amendment privilege.  "Yet, the Constitution does not guarantee that the exercise of Fifth Amendment rights will be without cost in the civil arena.  A party who chooses to assert the privilege against self-incrimination in a civil case must live with the consequences."  *In re Phillips, Beckwith & Hall*, 896 F.Supp. at 560-61 (omitting quotations and collecting cases).

and appropriately exclude evidence that is untimely, in violation of a scheduling order.  *See, e.g.*, *Pickern v. Pier 1 Imports (U.S.), Inc.*, 2006 WL 2061178, *4 (9th Cir. 2006) (district court did not abuse discretion by excluding expert's testimony for failure to comply with a scheduling order); *May v. Stahl*, No. 95-2371, 1996 U.S. App. LEXIS 15549, at *2-4 (4th Cir. 1996) (unpublished).  Nothing in the record suggests or supports Anderson's contention that the bankruptcy court's exclusion of the two depositions was an abuse of discretion.

## C.

Additionally, Anderson argues that the bankruptcy court erred in finding that two of the appellees, One Stop Services and Joseph Ward, fell within ta good faith exception to the Virginia Licensing statute.  Specifically, Anderson argued in the bankruptcy court that these appellees were not licensed contractors and therefore, could not assert claims against the Anderson estate. The bankruptcy court disagreed, concluding that they were entitled to assert their claims because of Virginia's good faith exception for unlicensed contractors.  *See* Va. Code Ann. § 54.1-1115. In concluding that the safe harbor provision applied to appellees, the bankruptcy court found that appellees had acted in good faith and had no actual knowledge of Virginia's licensing requirement.  These findings of fact – that appellees acted in good faith and had no actual knowledge of Virginia's licensing requirement – are reviewed for clear error.  *See* Fed. R. Bankr. P. 8013; *In re Stanley*, 66 F.3d 664, 667 (4th Cir. 1995).  The application of Virginia law to these facts is reviewed *de novo*.  *In re Litton*, 330 F.3d 636, 642 (4th Cir. 2003).

Analysis of this issue properly begins with a brief review of the applicable Virginia law. Virginia law provides that contracting without a license is a misdemeanor.  Va. Code Ann. § 54.1-1115(A)(1).  Accordingly, an unlicensed contractor is not entitled to recover fees or

payments that result from the performance of unlicensed contracting services.  *See J.W. Woolard Mechanical & Plumbing, Inc. v. Jones Dev. Corp.*, 367 S.E.2d 501, 503 (Va. 1988).  Yet, this is not a blanket prohibition; Virginia law provides a good faith exception, allowing unlicensed contractors to recover fees where they substantially performed "within the terms of the contract in good faith and without actual knowledge that a license or certificate was required."  Va. Code Ann. § 54.1-1115(c).  This statutory good faith exception strikes a sensible balance between penalizing contractors who knowingly violate the statutory scheme, while excusing contractors "who perform in good faith and whose violations are inadvertent."  *J.W. Woolard Mechanical & Plumbing, Inc.*, 367 S.E.2d at 505.

The record reflects that both One Stop Services, through Mr. David Gold, and Joseph Ward, presented ample evidence that they acted in good faith and without actual knowledge of Virginia's licensing requirements.  For example, Mr. Gold explained that he was unaware of Virginia's licensing requirements because he was licensed in Maryland and his work in Virginia was limited to construction of the Anderson residence.  Similarly, Mr. Ward testified that, as a handyman, he was unaware of Virginia's licensing requirement.  Moreover, both Mr. Gold and Mr. Ward both testified that Charles Anderson suggested to them that they would be working under Anderson's general contractor's license.

On appeal, Anderson concedes, as he must, the presence of this testimony in the record. In response he merely asserts that the bankruptcy court ignored other portions of Mr. Gold's testimony and that Mr. Ward's testimony "had an easy convenience" to it.  Significantly, however, Anderson provides no persuasive record evidence that either One Stop Services or Joseph Ward acted in bad faith or had actual knowledge of Virginia's licensing requirements.

18

Accordingly, the bankruptcy court's ruling in this respect is neither clearly erroneous factually, nor incorrect legally.

### D.

Anderson's fourth argument on appeal is that the bankruptcy court improperly ruled that a *prima facie* valid claim was sufficient to establish the claim where Anderson provided no evidence to the contrary.  In Anderson's view, the bankruptcy court impermissibly shifted the burden of proof on claim validity to him.  Anderson's argument in this respect misunderstands the Bankruptcy Code's burden shifting scheme.

The Bankruptcy Code's burden-shifting scheme provides that the creditor's filing of a proof of claim is *prima facie* evidence of the amount and validity of the claim.  11 U.S.C. § 502(a); Fed. R. Bankr.P. 3001(f).  After the creditor makes this filing, the burden then shifts to the debtor to object to the claim and introduce evidence to rebut the claim's presumptive validity. 11 U.S.C. § 502(b).  As the Fourth Circuit explained "[i]f the debtor carries its burden, the creditor has the ultimate burden of proving the amount and validity of the claim by a preponderance of the evidence."  *In re Harford Sands Inc.*, 372 F.3d 637, 640-41 (4th Cir. 2004).

It is undisputed that appellees filed proofs of claims sufficient to establish *prima facie* evidence of the amount and validity of their claims.  This, then, operated to shift the burden to Anderson to rebut the claims' presumptive validity.  The parties disagreement focuses on whether the evidence Anderson proffered was sufficient to rebut this presumption.  To rebut the appellees *prima facie* evidence, Anderson sought to introduce two depositions of contractors to prove that the contractors were not licensed to perform the contracting work for which they sought compensation.  While it is doubtful whether these depositions would have been sufficient

to carry Anderson's burden to rebut the *prima facie* validity of the claims, these depositions were properly excluded for the reasons already stated.  *See supra*, at Part III B.  Because the excluded depositions were the only evidence Anderson offered to rebut the creditors' *prima facie* case, and because Anderson adduced no other evidence to rebut the presumptively valid claims, the presumption properly carried the day for the claimant-appellee.[27]  *See In re Harford Sands Inc.*, 372 F.3d at 640 ("The debtor must introduce evidence to rebut the claim's presumptive validity.").  Accordingly, given that Anderson proffered no admissible rebuttal evidence, the bankruptcy court properly concluded that Anderson had not rebutted the appellees' presumptively valid claims.

### E.

Anderson's final objection is that the bankruptcy court erred when it allowed the Unsecured Committee of Creditors ("the Committee") to take discovery related to appellees' claims and to participate in the claim objection proceeding.  While Anderson concedes that creditors' committees may, under certain circumstances, initiate adversary proceedings against a debtor, he argues that those circumstances were not present here.  Specifically, he argues that (i)

---

[27]In his reply brief, Anderson notes that he offered at the bankruptcy court hearing a printout from the Department of Professional and Occupational Regulation that, according to Anderson, would demonstrate that appellee Sam's Floor Covering had only a Class C contractor's license, which Anderson argues would not have permitted Sam's Floor Company to perform work in excess of $7,500.  By Anderson's own admission, however, this document was also produced late, in violation of the pretrial Order.  *See* Reply Br. at 15.  Given this, the bankruptcy court properly declined to admit the printout into evidence.  Transcript of September 23, 2005 Hearing at 164.  As an initial matter, Anderson did not appeal this ruling, nor did he provide any persuasive argument to show that the bankruptcy court's exclusion of this printout was an abuse of discretion.  It is of no consequence, however, because in view of Anderson's admitted violation of the pretrial Order, it cannot be said that the bankruptcy court abused its discretion by excluding the printout.

absent a lack of diligence by the trustee (which is not present here) there is no precedent allowing

a creditors' committee to litigate against a debtor and (ii) even assuming the propriety of

allowing the Committee to participate in discovery and the claim objection proceeding, the

Committee here did so improperly because it pursued the interests of individual creditors rather

than the interests of the class of creditors as a whole.  Appellees respond that the Committee's

participation was proper because the Bankruptcy Code allows creditors' committees to pursue

"other services . . . in the interest of those represented." 11 U.S.C. § 1103(c)(5).  Furthermore,

appellees argue that the scope of the Committee's participation was proper because it was limited

to demonstrating that the Andersons, both Donald and Charles, engaged in a calculated plan to

defraud the creditors, an issue common to each of its constituent members.[28]  As these are mixed

questions of law and fact, the bankruptcy court's determinations in this respect are reviewed *de

novo*.  *In re Litton*, 330 F.3d at 642.

 Analysis of this apparently novel issue[29] appropriately begins with an examination of the

---

[28]Appellees also argued that Anderson waived his right to object to the Committee's
participation in the bankruptcy proceeding by failing to raise his objection at the September 23,
2005 hearing.  This argument is easily resolved because at an August 9, 2005 hearing,
Anderson's  counsel clearly objected in to the participation of the Committee in the claim
objection proceeding.  The transcript of that hearing states, in pertinent part:

> The Court: I think that the initial question that [Anderson's counsel] raises is the
> standing of the creditors committee to participate in [the claim objection
> proceeding.]

Transcript of August 9, 2005 Hearing at 120.

Thus, Anderson has properly preserved his right to object to the Committee's participation in the
bankruptcy proceedings.

[29]The parties have cited no authority directly on point and none has been found.

proper role and responsibilities of a creditors' committee in Chapter 11 bankruptcy proceedings. In such proceedings, the trustee is required, in most cases, to appoint a creditors' committee to represent unsecured creditors.[30]  While the proper role of a creditors' committee in a Chapter 11 bankruptcy case "necessarily depends upon a factual determination on a case-by-case basis,"[31] the Bankruptcy Code enumerates a broad range of duties creditors' committees may perform. Specifically, the code provides that a creditors' committee may:

> (1) consult with the trustee or debtor in possession concerning the administration of the case;
>
> (2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;
>
> (3) participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan;
>
> (4) request the appointment of a trustee or examiner under section 1104 of this title; and
>
> (5) perform such other services as are in the interest of those represented.
>
> 11 U.S.C. § 1101(c).

In general, a creditors' committee acts in an "advisory and consultive capacity" to the trustee.  *In*

---

[30]11 U.S.C. § 1102(a)(1) (stating that trustee "shall appoint a committee of creditors holding unsecured claims").

[31]*In re Structurlite Plastics Corp.*, 91 B.R. 813, 819 (Bankr. S.D. Ohio 1988).  *See also* 7 *Collier on Bankruptcy* at ¶ 110.05[1][a] (stating that "[t]he actual role played by a committee in any particular case will depend on the size and nature of the particular case.  The larger and more complex the case, the greater the role that will be played by the committee").

*re Federation Workers Credit Union, Inc.*, 354 F. Supp. 1206, 1209-10 (N. D. Ohio, 1973).[32]

Yet, creditors' committees are not limited to this capacity; to the contrary, the broad scope of the permissible activities enumerated in the Bankruptcy Code belies the assertion that a creditors' committee is necessarily limited to an advisory and consultative capacity.  Indeed, this enumeration confirms the contrary, namely that a creditors' committee may properly engage in a very broad range of additional activities.[33]  The question is whether the Committee's participation in discovery and the claim objection proceedings falls within the broad scope of permissible activities contemplated by the Bankruptcy Code.

To answer this question it is first necessary to set out with clarity the precise activities the Committee engaged in here.  In this respect, the record plainly discloses that the Committee participated in portions of discovery and also participated in the claim objections proceeding.  Importantly, it is also clear that the Committee's participation in these respects was not limitless; it focused on the Anderson's allegedly fraudulent scheme to defraud the Committee's members.[34]  In other words, through its participation the Committee did not seek, or purport, to assert the

---

[32]*See also* committee notes to 11 U.S.C. § 1101(c) (stating that committee's duties include "consult[ing] with the trustee or debtor in possession").

[33]For example, as the Collier treatise explains, a committee's investigative authority "is extremely broad" and it "may undertake whatever investigation is appropriate to enable it to fulfill its duty to monitor the operations of the debtor and participate in the formulation of a plan."  Moreover, in fulfilling its statutory duties "[a] committee should also not hesitate to oppose actions of the debtor in court." *See* 7 *Collier on Bankruptcy* at ¶ 1103.05[1].

[34]*See Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 256 ( 3d Cir. 2001) ("We have construed § 1103(c) as implying a fiduciary duty on the part of members of a creditor's committee . . . toward their constituent members.  A committee member violates its fiduciary duty by pursuing a course of action that furthers its self-interest to the potential detriment of fellow committee members.").

23

rights or claims of any particular Committee member.  Moreover, the record reflects that the

division of discovery tasks between the Committee and the claimants' attorney was reasonable

under the circumstances.  Specifically, when Anderson objected to virtually all claims asserted

against the estate, Gordon Gay, the attorney representing all the creditors, petitioned the

bankruptcy court to permit the Committee, by its counsel, Kevin O'Donnell, to participate in

discovery, thereby relieving Gay of some of the discovery burden.  Also, Gay and O'Donnell

explained to the bankruptcy court that they would divide discovery into essentially two parts to

minimize duplication of efforts: The Committee, by O'Donnell, would seek discovery of

materials related to the alleged fraud by the Andersons, whereas the individual creditors, by Gay,

would seek discovery on all other matters pertaining to the individual claims.  Noting (i) that

Anderson had objected to almost all of the creditors' claims and (ii) that the Committee's

participation in discovery and the claim objections proceeding was limited to pursuing

information regarding the alleged fraud – a matter common to every creditor's claim – the

bankruptcy court allowed the Committee to participate in both discovery and the claims objection

proceeding.[35]  *See* Transcript of August 9, 2005 Hearing at 120-22.

    Given that the Bankruptcy Code explicitly provides that in addition to a variety of

important duties, a creditors' committee "may perform such other services as are in the interest of

---

[35]It is important to note that it is undisputed that the Committee's involvement in the bankruptcy proceedings in issue does not qualify as an  "adversary proceedings."  In adversary proceedings, a bankruptcy court permits a creditors' committee to stand in the shoes of a negligent trustee because the trustee has,  in the view of the bankruptcy court, abdicated his responsibilities or otherwise abused his discretion as custodian of the estate.  *See, e.g.*, *In re STN*, 779 F.2d at 904 (authorizing adversary proceedings where  the trustee or debtor-in-possession "unjustifiably failed to bring suit or abused its discretion in not suing to avoid a preferential transfer").

those represented," there can be no doubt that the bankruptcy court did not err in allowing the Committee to participate in both discovery and the claim objections proceeding.[36]  In these activities, the Committee was plainly performing "services" in the interest of those the Committee represented.  Importantly, the Committee's activities focused on the Anderson's allegedly fraudulent scheme to defraud all the Committee's members, thus fulfilling its primary responsibility to represent the interests of its members.[37]  *See In re Nationwide Sports Distrib., Inc.*, 227 B.R. 455, 463 (Bankr. E.D. Pa. 1998).  Therefore, Anderson has failed to show that the bankruptcy court erred in allowing the Committee to participate in discovery and the claim objections proceeding.

In sum, none of Anderson's objections regarding the bankruptcy court proceedings are meritorious.  Accordingly, the judgment of the bankruptcy court must be affirmed.

An appropriate Order will issue.


|  |  |
|---|---|
| Alexandria, Virginia | _____/s/_____ |
| August 30, 2006 | T. S. Ellis, III |
|  | United States District Judge |

---

[36]Notwithstanding the broad sweep of § 1101(c)(5), "other services" is not limitless; at a minimum the committee's services must be in "the interest of those represented." 11 U.S.C. § 1101(c)(5).

[37]Indeed, Anderson has not argued, let alone offered any evidence, that the Committee's discovery requests and litigation tactics, that he alleges supported particular class members, prejudiced other class members in any way.